UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| GUSTAVO RAMOS,<br><br>           Plaintiff,<br><br>       v.<br><br>CLARK COUNTY DETENTION CENTER *et al*,<br><br>           Defendants. | Case No. 2:19-cv-00124-RFB-VCF<br><br>**ORDER** |

## I.   INTRODUCTION

Before the Court are motions for summary judgment by Defendant Naphcare, ECF No. 64; Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Joseph Lombardo, and Michael Lusch, ECF No. 68; and Defendants Yolanda King and Jeff Wells, ECF No. 69.

For the reasons stated herein, the motions are GRANTED.

## II.  PROCEDURAL HISTORY

On September 27, 2019, Plaintiff, who was detained at Clark County Detention Center ("CCDC"), filed the operative amended complaint pursuant to 42 U.S.C. § 1983. ECF No. 20. On November 8, 2019, this Court issued a screening order that dismissed CCDC with prejudice. ECF No. 25. The screening order permitted Plaintiff's first and second claims, alleging Fourteenth Amendment inadequate medical care, to proceed against Defendants Naphcare, LVMPD, Lombardo, King, and Wells. Id. at 8. The screening order also allowed Plaintiff's third claim,

alleging Fourteen Amendment denial of access of the courts, to proceed against Defendants Lusch, Lombardo, and LVMPD. Id.

On December 17, 2019, Defendants King and Wells filed a Motion to Dismiss. ECF No. 34. On January 1, 2020, Plaintiffs responded. ECF No. 40. On January 9, 2020, Defendants filed a reply to Plaintiff's response. ECF No. 42. On September 23, 2020, parties jointly submitted a second stipulation for extension for time regarding discovery. ECF No. 57. On October 7, 2020, the Court denied King and Wells' Motion to Dismiss. ECF No. 59. Discovery closed on March 14, 2021. ECF No. 53.

On June 23, 2021, Defendant Naphcare filed their Motion for Summary Judgment. ECF No. 64. Plaintiff responded on July 14, 2021. ECF No. 66. Naphcare replied on July 28, 2021. ECF No. 67. On September 13, 2021, Defendants LVMPD, Lombardo, and Lusch filed their Motion for Summary Judgment. ECF No. 68. Plaintiff responded on October 4, 2021. ECF No. 71. Defendants replied on October 18, 2021. ECF No. 74. On September 13, 2021, Defendants King and Wells filed their Motion for Summary Judgment. ECF No. 69. Plaintiff responded on October 4, 2021. ECF No. 72. Defendants replied on October 15, 2021. ECF No. 73.

On March 16, 2022, the Court heard oral argument on the motions for summary judgment and took the parties' arguments under submission. This order follows.

### III. FACTUAL BACKGROUND

#### A. Undisputed Facts

The Court finds the following facts to be undisputed based on the record:

From October 13, 2010 to September 26, 2019, Plaintiff was incarcerated as a pretrial detainee at CCDC. At all relevant times, Defendant Naphcare was the provider for inmate healthcare services at CCDC.

Since as early as 2007, Plaintiff suffered from various eye and vision problems. In April 2015, Plaintiff was diagnosed with primary open angle glaucoma, dry eye syndrome, and combined senile cataract. Between July and August 2016, Plaintiff began to experience escalating problems with his vision. Plaintiff filed a medical request on August 29, 2016. In response, CCDC

indicated he would be transferred to a different module per medical professionals' advice.

On March 21, 2017, Plaintiff saw Dr. DeBry at Nevada Eye Surgeons. Dr. DeBry documented loss of eyesight in one of Plaintiff's eyes and loss of most of the vision in the other eye. On May 25, 2017, Plaintiff's court-appointed criminal defense attorney filed a request with the Office of Appointed Counsel ("OAC") to cover the costs of the eye appointment and transport. The request was approved as an ancillary expense related to expert evaluation of Plaintiff's ability to assist in his defense. On June 13, 2017, Dr. DeBry examined Plaintiff again and recommended a Descemet's stripping endothelial keratoplasty ("DSEK") procedure, colloquially known as a corneal transplant. On August 15, 2017, defense counsel submitted a second "Expert Witness Request" concerning Plaintiff's eyesight, advising that Plaintiff was scheduled for eye surgery and asking OAC to pay for the surgery in the amount of $11,033.89. Plaintiff's counsel asserted that the surgery was necessary for Plaintiff to assist in his defense. Defendant Wells at the OAC denied the request. On October 20, 2017, the OAC received two more requests from Plaintiff's criminal defense counsel, seeking payment for the cost of an eye exam and transport, as well as $11,033.89 for the eye surgery. Wells approved the request for exam and transport, but again denied the request related to the surgery.

On January 12, 2018, Dr. DeBry again recommended the DSEK procedure. On March 5, 2018, Plaintiff received the DSEK procedure, which was performed by Dr. DeBry. Plaintiff had several follow-up appointments with Dr. DeBry between March 2018 and June 2019. He also saw other medical providers regarding his eye health in that time. Plaintiff submitted another medical request on December 29, 2018, indicating his treatment was previously delayed "for reasons of cost, causing further damage to [his] eyesight." In response, CCDC indicated that an ophthalmology appointment would be scheduled.

B. Disputed Facts

The parties dispute the following facts: whether Plaintiff experienced a delay in obtaining any medically necessary procedures; whether any delay in obtaining medically necessary procedures caused Plaintiff further injury – namely in the form of vision loss; whether Defendants denied Plaintiff funding for any medically necessary procedures; whether Defendants had a policy

or practice of denying funding for medical procedures; whether jail officials informed Plaintiff that the costs of his procedures were not covered because he lacked insurance or government benefits; and whether Plaintiff was ever denied access to his counsel in the course of litigating this matter.

### IV. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). The nonmoving party may not merely rest on the allegations of her pleadings; rather, she must produce specific facts—by affidavit or other evidence—showing a genuine issue of fact. Anderson, 477 U.S. at 256. It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

### V. DISCUSSION

#### A. Motion for Summary Judgment by Defendant Naphcare, Inc. (ECF No. 64)

Naphcare first argues that Plaintiff's claims should be dismissed for failure to exhaust administrative remedies. Naphcare argues that at the time of the events underlying this suit, CCDC had a policy that provided inmates with a specific medical grievance procedure. According to the policy, inmates could file one "health care complaint" per week. Staff would have to respond

4

within 10 business days. If unsatisfied with the result, the inmate could then file a "healthcare grievance" within 5 days. If the grievance is not resolved to the inmate's satisfaction, he may then submit an appeal to the health services administrator within 5 days following the inmate's receipt of the response. Naphcare argues that Plaintiff did not exhaust his administrative remedies. Defendant contends that while Plaintiff submitted five medical requests during the two years prior to filing suit, he did not submit any complaints—the first step towards exhaustion. Further, even if Plaintiff's medical requests were to be construed as complaints, Naphcare argues Plaintiff did not complete the process by filing a grievance, followed by an appeal.

On the merits, Naphcare also argues there is no evidence of inadequate medical care, and that summary judgment should thus be granted in Defendant's favor. Defendant argues that between January 22, 2017 to June 30, 2019, Plaintiff was seen by NaphCare personnel at least 18 times. Defendant further notes that the two expert reports in the record demonstrate that Naphcare provided care to Plaintiff that met the standard of care, including by providing Plaintiff with off-site ophthalmology visits, the DSEK procedure, and prescription medications. Defendant argues that Plaintiff cannot show that by failing to take taking reasonable measures to abate a risk of harm, Naphcare caused injury to Plaintiff.

Plaintiff responds that he was not required to exhaust administrative remedies because the allegations in his case are "directly connected to the administrative actions of CCDC and its subordinate agents such as Naphcare, and therefore any such grievance would have been subject to the same decision-making parties that had already denied the requests previously made for medical support." On the merits, Plaintiff argues that inadequate medical care is proven by Defendant's failure to take proactive or preventative action to salvage his eyesight. Specifically, Plaintiff argues that he received inadequate medical care by being forced to withstand a delay in surgical treatment. He notes that he was first recommended for the DSEK procedure in June 2017, but did not receive the surgery until March 2018. Plaintiff argues this delay led to vision loss, and that Defendants acted with deliberate indifference to his known medical needs.

As a preliminary matter, the Court finds that Plaintiff's claims against Naphcare are not barred by Plaintiff's failure to administratively exhaust. The Prison Litigation Reform Act

5

("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate "must use all steps the prison holds out, enabling the prison to reach the merits of the issue." Griffin v. Arpaio, 557 F.3d 1117, 1119 (9th Cir. 2009). Proper exhaustion requires the inmate to comply with administrative regulations and procedures. Woodford v. Ngo, 548 U.S. 81, 90-91 (2006). If a defendant demonstrates that a prisoner-plaintiff fails to exhaust available remedies, the plaintiff may rebut that with evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014).

The Court finds that at the time Plaintiff was incarcerated at CCDC, the facility had a 3-step grievance process for medical concerns: (1) filing of a health care complaint; (2) if unsatisfied with the result of the complaint, filing of a health care grievance within 5 days; (3) if unsatisfied with the result of the grievance, filing of an appeal within 5 days. The Court further recognizes that it is undisputed that Plaintiff did not fully complete this process. He submitted medical requests for care, but did not file complaints, grievances, or appeals. However, the Court concludes that the circumstances of Plaintiff's case made the administrative remedies "effectively unavailable" to him. Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014). Plaintiff alleges that he requested medical care but was informed by CCDC staff that they would not pay because he lacked insurance or government benefits. Plaintiff would reasonably be under the impression that any grievance submitted to the same parties would be met with the same response. This scenario resembles other cases in which the Court has determined that the exhaustion requirement was excused, where prison staff have indicated to an inmate that filing a grievance would be futile. See, e.g., Mitchell v. Cox, No. 2:12-cv-02082-RFB-CWH, 2015 U.S. Dist. LEXIS 25871, at *27-28 (D. Nev. Mar. 2, 2015) (excusing failure to exhaust where plaintiff was implicitly informed that there was "no further possibility that corrective action would be taken in response to his grievance"). Further, the Court notes that the intent of the exhaustion requirement is to place the facility on notice of issues raised by an inmate. See Griffin, 557 F.3d at 1120 ("The primary

purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation."). Where, as here, a Plaintiff has submitted numerous medical requests pertaining to the same concern with his eyes—even if not styled as a grievance—the facility is plainly on notice of the inmate's concerns, and the primary purpose for the exhaustion requirement is satisfied.

Turning to the merits of Plaintiff's Fourteenth Amendment claim against Naphcare, the Court first notes that the core allegation supporting Plaintiff's claim for inadequate medical care is that an unreasonable delay in the provision of surgery led to Plaintiff's vision loss. Plaintiff's counsel conceded at oral argument that any alleged injury that Plaintiff suffered is not the result of lack of care writ large. Rather, it is tied to a failure to timely provide a specific treatment – here, the corneal transplant/DSEK procedure. Plaintiff alleges he was told the surgery would not be timely provided to him because he could not pay for it, and that because nine months passed between the initial surgery recommendation and when he ultimately received the surgery, Plaintiff suffered vision loss.

For a pretrial detainee to establish inadequate medical care amounting to a Fourteenth Amendment due process violation, he must establish that: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved – making the consequences of defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. Gordon v. Cty. of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018). With respect to the third element, the defendant's conduct must be objectively unreasonable, as the mere lack of due care by a state official will not be held to deprive an individual of their Fourteenth Amendment rights. Id. The plaintiff "must prove more than negligence but less than subjective intent – something akin to reckless disregard." Id. On the record before it, the Court concludes that no reasonable jury could find the above elements to be established. In particular, the Court finds that the evidence in the record cannot satisfy the third and fourth elements of the Gordon test.

First, the Court notes that Defendant has put forth significant evidence to support its position that a delay in surgery did not cause vision loss or fail to stall progressive vision loss. Defendant's two medical experts both concluded that the medical treatment provided to Plaintiff met the standard of care, and that any delay in surgery did not lead to vision loss. Crucially, Dr. Schallhorn's report makes the following observation:

> Long-standing corneal edema can cause scarring, but this occurs <u>on the order of years, not months</u>. The DSEK procedure was medically necessary because corneal edema can cause vision loss as well as painful bullous keratopathy. . . . Two potentially vision-limiting complications of corneal edema are infectious keratitis from a ruptured corneal bullae and corneal neovascularization. It is important to perform the DSEK before the development of significant corneal scaring, a corneal ulcer (infectious keratitis) from a ruptured corneal bullate, or corneal neovascularization (invasion of new blood vessels into the cornea). <u>Neither of those conditions developed while Mr. Ramos was waiting for the DSEK.</u>

ECF No. 64-10 at 17 (emphasis added).

Dr. Schallhorn's report also concludes that "there is no evidence of damage to Ramos' vision due to the timing of the DSEK procedure, or any other alleged delay in ophthalmology care." <u>Id.</u> at 18. Plaintiff has come forth with no evidence to rebut Defendant's expert reports, nor is there evidence in the record to support the inference that, had surgery been performed earlier, it would have prevented the corneal scarring that leads to vision loss. Further, the Court finds there is unrebutted evidence in the record that prison staff would not have known surgery was urgently needed. Between June 2017 and March 2018, Plaintiff was twice recommended to undergo the DSEK procedure – first on June 13, 2017, and again on January 12, 2018. However, nothing in the record supports the notion that the procedure was emergent, or that medical providers indicated that failure to promptly schedule the surgery would lead to further deterioration of Plaintiff's vision. To the contrary, there is evidence in the record that the surgery was <u>not</u> urgent, that the surgery itself would itself carry significant risks, and that a delay in obtaining surgery did not lead to vision loss. For instance, on November 28, 2017, Plaintiff saw Dr. Depalo at the Abrams Eye Institute. On that date, regarding the previously recommended DSEK procedure, Dr. DePalo noted, "Patient advised that this is not an emergent procedure, and they may delay surgery if they wish." ECF 64-3, at CCDC062. Dr. DePalo also noted that he advised Plaintiff that corneal transplant carried

8

significant risks, including risk of "infection," "retinal detachment," "loss of eye or vision," and "rejection/failure of the transplant." Id.  Thus, even if a delay in surgery caused Plaintiff to suffer vision loss (which has not been established), there is no evidence in the record to support the notion that the consequences of delay would have been "obvious" to Defendant, as required under Gordon. 888 F.3d at 1125; see also Gardner v. Las Vegas Metro. Police Dep't, 831 Fed. Appx. 365, 365-66 (9th Cir. 2020) ("In light of the unique manifestation of [plaintiff's] underlying cancer, even viewing the facts in the light most favorable to plaintiffs, the record does not disclose a genuine issue of material fact as to whether his serious medical need was so apparent as to render the consequences of the defendants' conduct 'obvious.'").

Moreover, the Court finds that between June 13, 2017 (when the corneal transplant was first recommended) and March 5, 2018 (when Plaintiff received the DSEK procedure), Plaintiff was seen by medical staff at least two dozen times regarding his eye conditions, and that he was frequently seen by medical professionals outside of Naphcare/CCDC. See ECF 64-9 at 16-23. During these doctor's visits, Plaintiff was provided with various non-surgical treatments, including several different medicated eyedrops, to treat his eye conditions. The Court thus concludes that even if Plaintiff could show that Naphcare failed to act with "due care" by delaying the scheduling of his surgery, he cannot show that Naphcare's omissions or delay amounted to "more than negligence . . . akin to reckless disregard" of Plaintiff's health. Gordon, 888 F.3d at 1125.

As Plaintiff cannot show that Naphcare failed to take reasonable measures to abate a known medical risk, in a manner amounting to reckless disregard of Plaintiff's health, the Court grants Defendant Naphcare's Motion for Summary Judgment.

### B. Motion for Summary Judgment by Defendants LVMPD, Lombardo, and Lusch (ECF No. 68)

The Court next turns to the motion for summary judgment by Defendants LVMPD, Lombardo, and Lusch (collectively, the "Metro defendants").

With respect to Plaintiff's claim for inadequate medical care, the Metro defendants argue there is simply no evidence in the record that the LVMPD defendants ever interfered with Plaintiff's medical treatment during his incarceration or failed to cover necessary medical

expenses. The Metro defendants refer this Court to Plaintiff's extensive medical records, and argue that no reasonable juror could read Plaintiff's medical records and conclude that he was prevented from obtaining medical care while incarcerated at CCDC. Defendants emphasize that each of Plaintiff's medical requests were responded to by CCDC. Defendants also argue that there is no evidence of any policy or practice of denying pretrial detainees access to medical care or refusing to pay for necessary medical care, and there is no evidence that Lombardo or Lusch personally participated in any constitutional violation. Defendants note that Plaintiff's interrogatory response to Defendants' request that he identify which CCDC/LVMPD officers were responsible for preventing his access to medical treatment admitted as much, as Plaintiff responded: "I believe that Officer Monar, Nurse Elizabeth, and Lieutenant Taylor were involved. The Sheriff and his staff at CCDC/LVMPD are also to blame." Defendants argue that Plaintiff does not indicate how Lombardo was involved and does not name Lusch at all, thereby warranting summary dismissal of the inadequate medical care claim as against these defendants.

Defendants argue that Plaintiff's access to courts claim should also be denied for lack of evidence. Defendants argue there is no evidence that at any point in time Defendant Lusch denied Plaintiff access to his court-appointed counsel. Defendants argue that Plaintiff has conceded this, as he was asked in interrogatories to list and describe each time he was denied access to counsel, but failed to provide a response, merely writing: "see esq." Plaintiff was also asked in interrogatories to describe his understanding "of CCDC policy with regard to inmate visitation with legal representatives," to which he responded: "I don't know what the policies are. But the Constitution allows me legal representation." Defendants argue these responses demonstrate that Plaintiff has no evidence of being denied access to counsel.

Finally, with respect to both of Plaintiff's claims, Defendants Lusch and Lombardo argue they are entitled to qualified immunity.

Plaintiff argues that the evidence shows that LVMPD was deliberately indifferent to Plaintiff's medical needs because Plaintiff's corneal surgery was delayed, despite his numerous requests for treatment. Plaintiff also argues the Metro defendants denied Plaintiff access to the courts when, on September 2019, they turned Plaintiff's counsel away from CCDC. Plaintiff

argues that his counsel was denied access to the jail because he could not present his "bar card," and that this denial led to "unnecessary delays and communication issues" between Plaintiff and his counsel.

The Court finds that Plaintiff's claim for inadequate medical care against the Metro defendants must be dismissed on summary judgment for many of the same reasons that the claim must be dismissed against Naphcare. There is no evidence in the record that the Metro defendants failed to take reasonable measures to abate a risk of serious harm to Plaintiff, that any such omissions led to Plaintiff's injures, or that the consequences would have been "obvious." Gordon, 888 F.3d at 1125. As previously stated, the Court finds that the evidence in the record does not create a genuine issue of material fact as to whether Plaintiff was injured by any acts or omissions of jail staff. Even if injury could be established, the Court also finds the record to be devoid of any evidence that jail staff acted in a manner evincing "reckless disregard" for Plaintiff's health. Id.

The Court further notes that Plaintiff fails to adduce any evidence of municipal liability under section 1983. A section 1983 plaintiff may establish municipal liability in one of three ways:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. . . . Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. . . . Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it.
>
> Gillette v. Delmore, 979 F.2d 1342, 1346-1347 (9th Cir. 1992) (internal quotation marks and citations omitted).

Further, a defendant is liable under 42 U.S.C. § 1983 "only upon a showing of personal participation by the defendant." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983." Id.

11

Plaintiff has not produced evidence that would establish municipal liability under any of the above three theories. Plaintiff alleges that the Metro defendants had a policy or custom to deny him medical treatment because he could not pay for medical costs himself, but there is no evidence in the record to support this assertion. Nor has Plaintiff established that Lombardo or Lusch themselves—as officials with policy-making authority—denied him access to care. Finally, Plaintiff has not produced any evidence that anyone with policy-making authority at CCDC ratified a denial of medical care with respect to Plaintiff. In addition, the Court finds that the record contains no evidence that Lombardo or Lusch personally participated in denying Plaintiff medical care. The only mention of either of these defendants among the record evidence is Plaintiff's statement in response to Defendants' interrogatories that Lombardo and his staff "are also to blame" for his vision loss. Absent any other supporting evidence of personal participation, the Court finds that this is a mere conclusory allegation.

The Court also finds that Plaintiff's claim for denial of access to the courts cannot survive summary judgment. To establish a violation of the right of access to courts, an inmate must establish actual injury. Lewis v. Casey, 518 U.S. 343, 346 (1996). An actual injury is "actual prejudice with respect to contemplated or existing litigation, such as the inability to meet a filing deadline or to present a claim." Id. Plaintiff's counsel alleges that he attempted to visit Plaintiff in September 2019 at CCDC but was turned away because he could not present a "bar card." There is no sworn affidavit or declaration by Plaintiff's counsel attesting to this, nor is there any other evidence in the record to support this assertion. Further, even assuming that this incident did occur, there is no evidence in the record that this denial caused actual prejudice to Plaintiff. Plaintiff does not provide evidence that he missed any filing deadlines, was precluded from presenting any claims, or otherwise suffered any tangible injury because of this incident.

For the reasons stated above, the Court grants the Metro defendants' motion for summary judgment.

### C. Motion for Summary Judgment by Defendants King and Wells (ECF No. 69)

Finally, the Court addresses the motion for summary judgment by Yolanda King and Jeff

Wells. Defendants argue that summary judgment should be granted in their favor with respect to Plaintiff's inadequate medical care claim because there is no evidence in the record that they personally participated in any decision regarding Plaintiff's medical treatment that would give rise to a constitutional violation.

Defendant King argues she was not aware of Plaintiff's medical conditions or involved in decisions regarding the costs of his medical care at any point in time. Defendant Wells argues that his sole involvement in Plaintiff's case was to deny payment for Plaintiff's surgery through the OAC, and that this denial does not give rise to liability because the OAC is not a funding source for medical care to CCDC inmates writ large. Wells argues the OAC only pays for indigent defense and case-specific costs that are "reasonably necessary to provide an appropriate defense." Because Plaintiff's surgery did not fall under this umbrella and was not contemplated by the Administrative Plan for provision of indigent defense, Wells argues he cannot be held liable for denying the request. Wells argues he had no knowledge of whether surgery had been sought through the CCDC or whether it had been denied. Defendants further argue that they do not supervise jail operations—thus, even if they knew of any delay in medical care to Plaintiff, they could not be held legally responsible for such delay, because they lack supervisory authority over LVMPD/CCDC. Defendants also raise Naphcare and the Metro defendants' argument that there is no evidence that Plaintiff suffered harm causally linked to delay in treatment.

Plaintiff responds that Defendants King and Wells knew of Plaintiff's health conditions, as evinced by the fact that the OAC had authorized some of his requested compensation in the past, and thus they should have understood that he needed the surgery and that he needed OAC to pay for the surgery. Plaintiff argues that Defendants' refusal to pay for the surgery amounts to deliberate indifference, causing injury to Plaintiff.

The Court grants summary judgment with respect to King because there is no evidence in the record that she knew of or was responsible for Plaintiff's medical costs. The Court also grants summary judgment with respect to Wells because Defendants have submitted undisputed evidence that the OAC does not authorize requests for medical treatment that fall beyond the scope of an expert evaluation necessary to the substance of a criminal defense. See ECF No. 69-1, 69-2, 69-3.

Defendants have adduced evidence by affidavit that: (1) the OAC is not a general source of funding for CCDC inmates' medical costs; (2) that there is a separate source of funding for inmates' general medical costs—namely, the contract between the facility and the healthcare provider (here, Naphcare); and (2) Defendant Wells rejected Plaintiff's request that OAC pay for his surgery because he determined the surgery had nothing to do with Plaintiff's ability to participate in his own defense—in other words, Plaintiff's surgery fell beyond the scope of what OAC is authorized to pay for. See ECF No. 69-3. Plaintiff has produced no evidence to rebut Defendant's evidence so as to create a genuine issue of material fact for trial. As such, the Court grants Defendants' motion for summary judgment.

### VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Naphcare's Motion for Summary Judgment (ECF No. 64) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants LVMPD, Joseph Lombardo, and Michael Lusch's Motion for Summary Judgment (ECF No. 68) is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants Yolanda King and Jeff Wells' Motion for Summary Judgment (ECF No. 69) is **GRANTED.**

The Clerk of the Court is directed to close this case and enter judgment accordingly.

**DATED:** March 29, 2022.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**